GREGORIO PÉREZ RODRÍGUEZ, ETC., demandantes y recurrentes, *v.* JOSÉ SAURÍ AMADEO ET AL., demandados y recurridos.

Número: 12522   Resuelto: 13 de febrero de 1962

*Inés Acevedo de Campos* y *R. Muñoz Ramos,* abogados de los recurrentes; *Rivera Zayas, Rivera Cestero & Rúa,* abogados

de los recurridos; *Enrique Báez García,* abogado de U. S. Fidelity & Guaranty Co.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo y Rigau.

PER CURIAM: Después de celebrarse un juicio en los méritos, el tribunal de instancia declaró sin lugar la demanda incoada por Gregorio Pérez Rodríguez, por sí y en representación de su hijo menor de edad, Francisco Pérez, contra José Saurí Amadeo, Carmen Ana Amadeo Vda. de Saurí, Carmen Rita Saurí y la U. S. Fidelity Guarantee Co., esta última como aseguradora de los demandados Saurí Amadeo. En la demanda se reclamaron los daños y perjuicios sufridos por los demandantes como consecuencia de las heridas recibidas por el menor Francisco Pérez cuando un empleado de la demandada Carmen Ana Amadeo Vda. de Saurí, hizo un disparo con una escopeta de perdigones desde la finca de su patrono.[1]

Prácticamente no hay controversia en cuanto a que (a) la demandada, doña Carmen Amadeo Vda. de Saurí era dueña de la finca Constancia de unas 1,000 cuerdas de terreno, sita en la Playa de Ponce y que para la fecha de los hechos y desde hacía unos cuatro o cinco años, Feliciano Pérez era un empleado de doña Ana Amadeo como volteador o celador de dicha finca; (b) el 19 de febrero de 1953 Feliciano Pérez hizo unos disparos con una escopeta de perdigones en dirección a un grupo de personas, la mayoría de ellas, menores de edad y que uno de esos disparos hirió al menor demandante; (c) que como consecuencia, el menor y su padre sufrieron daños y perjuicios; (d) que en una caseta, cercana a la intersección de las calles Colón y Valdivieso, que había en la finca se guardaba una escopeta que se usaba por los celadores, entre ellos Feliciano, para proteger la finca contra los animales dañinos.

---

[1] Como consecuencia de estas heridas el menor perdió su ojo izquierdo.

El tribunal sentenciador concluyó, con amplia base en la prueba para ello, que Feliciano Pérez trabajaba 8 horas diarias, de 7 A.M. a 11 A.M. y de 1 P.M. a 5 P.M.; que el 19 de febrero de 1953, día en que ocurrieron los hechos, Feliciano trabajó ese horario y a las 5 de la tarde cesó en el trabajo y fue sustituido por otros volteadores o guardianes, entre ellos, uno de nombre Elías Quiñones. El Tribunal también concluyó:

"b) Ese día 19 de febrero, como al mediodía, Feliciano había tenido un incidente personal con un muchacho ya hombre y fuerte, en que aquél lo había cogido por el cuello y éste le dio una pedrada en la cabeza. Feliciano denunció o fue a denunciar a ese muchacho. Después de rendir su labor se ausentó del sitio. Según declaró, fue a su casa situada dentro de la misma Hacienda Constancia, luego al pueblo, y por la noche vino al sitio de los hechos. No aparece de la prueba las razones que tuvo para volver allí, pero de hecho se presentó allí y se puso a hablar con Quiñones, el empleado que le sustituyó. Motivado tal vez por el incidente ocurrido ese día, por las causas otras que fueran, existía un estado de hostilidad desde temprano en la noche por parte de un grupo de personas, mayormente muchachos, quienes lanzaban algunas piedras y proferían palabras insultantes al celador. Al llegar Feliciano los insultos recrudecieron contra él y recrudecieron las piedras. Se metió en la finca y tomando la escopeta de la caseta en donde estaba, le disparó causando las heridas al menor demandante. Aunque la prueba discrepa sustancialmente sobre este hecho, puede decirse con relativa certeza que por lo menos hizo dos disparos de la escopeta, el primero aparentemente no hizo daño a nadie y el segundo hirió al demandante. Este disparo se hizo desde la finca hacia la vía pública, en donde había personas y muchachos aglomerados en los alrededores, que salieron corriendo o huyendo.

"(6) A los efectos de la responsabilidad de la demandada Amadeo Vda. de Saurí, única que se ha de adjudicar por sentencia en este pleito ya que Feliciano Pérez no ha sido personalmente demandado, el Tribunal concluye, como cuestión de hecho, que al hacer uso Feliciano de la escopeta y dispararla hiriendo al demandante no lo hizo en defensa de los intereses de su principal o patrono, para redundar en beneficio de éste. Aun cuando

tomemos la prueba en la forma más favorable al demandante, la misma no nos convence de que Feliciano disparó defendiendo la propiedad en sí de su patrono o los intereses de éste contra destrucción, hurto o cualquier otra intervención dañina de tercera persona. La prueba más bien estableció que Feliciano hizo el disparo, ya fuera justificadamente o no, ya fuera en legítima defensa o en exceso de ella, mientras se defendía él, su persona, de ataques que le hacían. Por la naturaleza de la propiedad, una finca rústica con caña cortada en el suelo, no podría concluirse que el lanzamiento de piedras de tamaño más o menos corriente dentro de la misma por parte de unos muchachos iba a producir daño o destrucción de la propiedad en sí, como lo hubiera sido si se tratara del hurto, incendio u otra clase de destrucción." (Legajo de Sentencia, págs. 13 y 14.)

Y al formular sus conclusiones de derecho dicho tribunal se expresó así:

"Pero si a la circunstancia de que este empleado ya había terminado la labor del día muchas horas antes de ocurrir los hechos y que el empleo no exigía ni hacía obligatoria su presencia allí en esos momentos se adiciona el hecho fundamental, según concluimos de la prueba, que él no usó el arma en protección de los intereses del patrono ni para beneficio de éste, sino más bien en defensa, justificada o no, de su persona, debemos concluir como cuestión de derecho, que el patrono aquí no es responsable de los daños causados por el empleado. No debe entendérsenos como diciendo que el hecho de que un guardián o celador actúe en defensa de su persona automáticamente releva al patrono de responsabilidad. Precisamente, si el guardián defiende su persona contra ataque como medio de permanecer en el cumplimiento de su deber y no huir dejando los intereses del patrono sin la protección que debió darle, el caso sería uno claro de responsabilidad del principal, de existir los demás elementos necesarios. Sin embargo, la prueba fue al efecto de que no era Feliciano a quien correspondía guardar y proteger los intereses del patrono en el sitio y hora en que ocurrieron los hechos, y demostró que en aquel sitio y hora no ocurrió hecho alguno que tendiera a destruir o perjudicar los intereses patronales. Tan fue así que el guardián en funciones responsable de la propiedad allí presente no hizo uso del arma, ni realizó intervención otra alguna.

"Creemos que las conclusiones a que hemos llegado tienen apoyo en las siguientes autoridades: *Rodríguez* v. *Pueblo*, 75 D.P.R. 402 [410–411]; *Vigo* v. *Cartagena*, 71 D.P.R. 710; *Maysonet* v. *Sucn. Arcelay*, 70 D.P.R. 167; *González* v. *Cía. Agrícola*, 76 D.P.R. 398; *Suárez* v. *Saavedra*, 52 D.P.R. 684; *Suárez* v. *Saavedra*, 61 D.P.R. 605 * *Rivera* v. *Maldonado*, 72 D.P.R. 479; *Lloréns* v. *Lozada*, 73 D.P.R. 271.

"Esas decisiones han sostenido unas la responsabilidad del patrono y otras la han negado, pero en todas ellas es claro el principio de que aun en aquellos casos en que el empleado se exceda o cometa error de juicio, o actúe arbitraria o criminalmente, o contra las instrucciones del patrono, si bien puede existir responsabilidad patronal, en su actuación debe haber algo que bien expresa, o bien implícitamente, redunde en pro de los intereses del patrono y en beneficio de éste. Ese algo es el nexo lógico o de necesaria ocasión entre la incumbencia y el hecho ilícito que se discute en *Rodríguez* v. *Pueblo* y en *González* v. *Cía. Agrícola, supra.*" (Legajo de Sentencia, págs. 16 a 18.)

Del récord no surge que las anteriores conclusiones sean erróneas. La prueba presentada por los demandantes para establecer el hecho de que en el momento de hacer los disparos, Feliciano actuaba en el desempeño de sus deberes como volteador o guardián de la finca o en defensa de los intereses de su patrono o para beneficio de éste, no convenció al tribunal sentenciador, una vez dirimido el conflicto en la prueba oral, y su conclusión en sentido contrario no es claramente errónea ni deja de estar sostenida por prueba sustancial. A los efectos de establecer ese hecho, esencialísimo en este litigio, los recurrentes dan gran énfasis al testimonio del Sargento de la Policía, Juan Piña Agosto. Fue él quien condujo a Feliciano al cuartel de la policía. Declaró que sabía que Feliciano trabajaba en la finca desde donde se hicieron los disparos; que por muchos años lo ha visto en la pieza de caña de día y de noche, a caballo y a pie; que por varios años lo ha visto de día y de noche en el cuartel de la policía cuando iba a

---

* Cita correcta: 60 D.P.R. 605.

presentar querellas; que en otras ocasiones, antes de los hechos, vio a Feliciano por las noches en la pieza de cañas, a veces a caballo y a veces a pie, caminando por allí; el día de los hechos lo vio por la mañana, por la tarde y por la noche en el cuartel pero esa noche no lo vio en la pieza de cañas y de noche lo veía especialmente en tiempo de zafra y que Feliciano vivía dentro de la finca de Saurí.

La circunstancia de que Feliciano fuera visto en otras ocasiones caminando por la finca durante las horas de la noche, o presentara querellas en el cuartel de la policía podría dar lugar a la inferencia de que en esas ocasiones Feliciano desempeñaba las labores de su cargo, pero ello no establece afirmativamente el hecho de que en la noche de los sucesos, él estuviera trabajando para su patrono ni que al hacer los disparos actuara en defensa de sus intereses. Y esto es así, con mayor razón si se considera que en el récord hay prueba, creída por el juez sentenciador, al efecto de que el día de los disparos, Feliciano cesó en su trabajo a las cinco de la tarde, y fue sustituido por otro empleado. Además hay prueba explicativa de la presencia de Feliciano en la finca durante aquella noche, así como del origen de todo el incidente que culminó en los disparos, la que resulta incompatible con la teoría de los demandantes recurrentes en cuanto a la función que allí y entonces desempeñaba el susodicho empleado.

Algunos eslabones aislados en la prueba de los demandantes, tales como la contestación que dio Feliciano a Ricardo, a saber: "Para eso me tienen aquí, estos sinvergüenzas los voy a matar", o aquellas otras expresiones puestas por un testigo en labios de Feliciano, "me están robando la caña", "Para eso estoy aquí, para defender esta caña porque me están robando las cañas este chorro de pillos", no merecieron crédito al juzgador y ante el serio conflicto que existió en la prueba, y la presencia de otros hechos y circunstancias que hacían dudosa esa prueba, nada obligaba a quien la apreció y aquilató a llegar a la conclusión última de que esa noche

506

Feliciano actuó en el curso de su empleo y en defensa de los intereses de su patrono.

Por otro lado, los hechos considerados probados en este caso no justifican que consideremos la posibilidad de imponer responsabilidad a la demandada bajo la doctrina del instrumento peligroso. Véase, Harper and James, *The Law of Torts*, Vol. 2, Sec. 26.10, pág .1393.

*Por los motivos expuestos se confirmará la sentencia dictada en 12 de septiembre de 1956 por la Sala de Ponce del Tribunal Superior.*